Good morning, Your Honors. Knute Johnson along with Emerson Wheat on behalf of Appellant Cabrera-Perez. Your Honors, there are two issues in this case. I'd like to focus in on the breakdown in the relationship between the appellant and his trial attorney. And with the Court's permission, I believe the Court has given us, is it 10 minutes to argue? You have 15, should be 15 minutes. Okay. Well, I'd ask to reserve 5 minutes. Yeah. And that's your total time on the clock, so you want to stop when you see 5 minutes left. All right. Thank you very much. Your Honors, I think the controlling opinion in this case is United States v. Winn. And the similarities between Winn and this case are really striking. In Winn, the trial court, I believe it was in Guam, refused to continue a trial that Appellant Winn in that case wanted to bring a new attorney on and that the Court viewed very close to trial, perhaps even on the day of trial. And the trial court viewed that as a really just a move to continue the trial for no reason. The Appellant Winn told the Court that he had a lack of contact with his attorney, and that's exactly what Mr. Cabrera-Diaz said in this case. The Appellant Winn told the trial court, my attorney has accused me of these charges, he's judged me guilty, and we're not communicating. My attorney just walked off. So let's credit everything that your client claims about the breakdown in relationships. Why should we handle that on direct appeal instead, as the district court suggested, that you handle that on habeas? We can make a full inquiry, we can get depositions or statements from the attorneys. Because that's precisely what happened in Cabrera-Perez, is that the district court reversed, or rather the court of appeals reversed, this court reversed, because the record is so clear there was a total breakdown in communication. Well, the total breakdown is tempered by the fact that the judge found contemporaneous with the discussions that your client was engaging in obstructionist tactics, that this was a stunt that he was pulling. That's, you know, it may be strategic for your client to push this off to habeas in order to have a fuller inquiry and get a statement from the lawyer under oath and so on, rather than do it on this record. Because you've, right now, you've got a record in which the judge says, you've rolled over and gone limp on us, and you've misbehaved. You know, the attorney in this case did make a full and complete statement. It was testified and cross-examined during the motion at a new trial. And just like in Wynn, what the district court suggested is that we'll just keep this lawyer, and if they were ineffective, we'll give you a new lawyer for appeal or for habeas. And, frankly, that interferes with the attorney-client relationship, because it put the appellant in this case and in Wynn in the position of not having confidence in their lawyer. It's just now it's just we're rolling the dice, and if I lose, that's when I get the new lawyer, which is what they wanted. And that is unfair to the process. It's unfair to the appellant. But didn't the district court find that Cabrera Perez's true reason why he wanted another lawyer was not his inability to communicate with lawyer Morell, but the fact that he was unhappy with the deal the government offered him and his desire to avoid trial until the deal got better, which it wasn't going to get? That is a product of the breakdown in relationship. And I think you can judge that on the record. The two of them aren't communicating. And don't forget that. I mean, it's pretty clear that they are communicating. Morell is telling them, this is what the government offers. And the defendant is saying, I'm not satisfied with that. And Morell is saying, that's all I can get you. And now he wants a different attorney. Maybe he can get a better deal. Is that a reason for a new attorney? That is. That is? Let me explain why. The record in this case is that on October 5th, Mr. Morell was appointed by the district court. Mr. Morell took the case at that time. And the record shows that at that time he had filed. Morell was his second or his third attorney? His third attorney. Federal defender. He was originally appointed an attorney. Then the case was indicted. And the court appointed, that was in August, early August. Federal defenders began representing him. And federal defenders conflicted off on October 3rd, telling the court they had an actual conflict. This was not a conflict that the client is being a big pain. We're not really getting along. They said, we have an actual conflict and we can't represent him. I don't know what that conflict was. It's not clear to me from the record. In any event, that means that really from a six amendment standpoint, the whole time federal defenders was involved, even though they did a fantastic job briefing up the issue and they really worked the case on the paper as well, he's under the sixth amendment unrepresented because he has conflicted counsel. He gets a new attorney on the fifth. So we're now slightly under two months since indictment. We're still within the speedy trial clock, although the record the district court makes is that this is the third trial date. But it's not really the third trial date because it's still within the speedy trial clock. There's excludable time for motions to be heard. And the reason for the continuances had been to hear the very lengthy, well-briefed, and difficult 1326D motions. So Mr. Morell gets appointed on the fifth, tells the court, fine, there's a trial date on November 28th. I just want to let the court know I have another trial on the 15th in this courthouse before that. And so if we fast forward now to the 22nd, which is the motion in limine, or rather the motion hearing state and the motion in limine, the record's clear then. The relationship is already broken down. And it's broken down because we know from the facts there that Mr. Morell has seen his client fewer times than the It's sort of an extreme case. The opinion indicates that district court had made up its mind in advance, wouldn't give any explanations for denying the continuance and the request for new counsel was biased. The language of the opinion is just replete with that sort of language. Whereas here, it's hard to say that the district court didn't take time. He spoke to Mr. Cabrera. He went through the process. He gave his reasons. He made findings on the record. Why isn't this case more like Castle, where we upheld the district court's determination, than it is like Wynn, which seems like a much more extreme sort of situation? Because in Wynn, or rather in this case, the breakdown in relationship began well before the trial started. And that's really then when there's acting up by the defendant who's terrified, because he knows how much he's got nine years. This is a very serious case. He knew how much time he was looking at. And he needed an attorney who would counsel him, who would sit with him and take the time, which apparently did not happen in this case. Are you saying the district court's findings are clearly erroneous based on this record? Is that your position? Yes. And I don't think they're supported by facts. The court said at trial, and I'd like to back up again to the October 5th hearing when Mr. Morell took the appointment, when he said, I'll take it, but I'm pointing out to the court that I have a trial on November 15th. And the district court then said, if you need any additional time, I'll give it to you. And the judge continued the trial date to the end of November. And Mr. Morell never asked for a continuance, except at the – when the – Didn't he? I thought he requested the fourth continuance in that case to discuss the plea offer. And that's the continuance the court should have granted. Clearly, he hadn't had time to talk to his client about the plea offer, which has to be done well in advance of trial, particularly with a client who's emotional and difficult and who, at that point in the case, had lost all faith in his attorney. The essence of the continuance request in this case, it's not – this is not about competence of counsel. This is about a total breakdown in the relationship that's reflected in the record. And I think it's also reflected in Mr. Morell's testimony to the district court that there was yelling going on. They're yelling and screaming at each other in their meetings. And that's not effective communication. Mr. Cabrera, for whatever conflict federal defenders had, did very well with them, and it's probably very unfortunate they weren't able to continue on the case. But for whatever reason, perhaps the record suggests that it's Mr. Morell's, seeing him less than one time a week before a trial where the client's going to get nine years caused a total breakdown. But it doesn't matter, really, what caused the total breakdown. There was a total breakdown in communication, and the court should have continued to either sort that out or appoint a new attorney. And with that, Your Honors, I'd like to reserve time. Remaining time. Thank you. Thank you, Mr. Johnson. May it please the Court. Kyle Martin for the United States. I want to start where the defense left off, which was talking about where we are. And he said we're not at a place where we're deciding on whether this was effective assistance of counsel. We're deciding whether there was a breakdown of communications. And I think that's the point. It's that the trial judge had a lengthy inquiry to determine on the first day of trial whether there was a breakdown of communication. And he, sitting in that position, able to observe all the facts, determined that there was not. And in the record, I believe it's in the United States, supplemental excerpts, pages 700 to 720, it's about 20 pages that it goes on, this inquiry. And so if Gwyn is over here, if Gwyn is the extreme case of the trial judge conducting virtually no inquiry, then this case is on the exact opposite end of the spectrum. This is a trial judge conducting a thorough inquiry and going into each fact the defendant brought up. For instance, the defendant began not by saying that there was a breakdown of communication. The defendant began by saying, Your Honor, my counsel told me that he would be able to get the Arizona felony reduced to a misdemeanor, and he has not been able to do that. And the court follows up on that and asks the counsel, well, did you try to do this? And Mr. Murrell confirms that he had talked about it but then determined that that was not possible. And then it comes out, the defendant says, well, basically, I'm just not happy with the offer. And I think that was the crux of his complaint, both at this hearing and throughout the trial. The defendant wasn't happy with the offer that the government was making. And so they talked about the offer. And defense counsel says, yes, Your Honor, the offer is that it would be a stipulated facts trial, and then he would be free to challenge the demotion on appeal. And Mr. Murrell goes on to say, and I counseled him not to accept this offer because I didn't think it was favorable. He was getting no sentencing benefit. And so the judge took that into consideration, explained carefully to the defendant that it's not the court's place to force the government to make an offer, but that's something that only the government can do. And this goes on throughout the hearing. Throughout the hearing, the defendant brings up a point, and the court carefully addresses it by talking to the defendant and the defense counsel. In Gwin, we apparently had a situation where the trial judge made up his mind on the motion before the defendant was even there. A retained counsel came in the first day of trial and said, Your Honor, I'd like to represent the defendant in this case. And without the defendant even being there, the trial judge said, we're not going to delay this trial at all for you. If you want to jump on with the federal defender, you're welcome to, but we're not going to delay this case. So he made that determination without even asking the defendant about it. Whereas in this case, again, you see 20 pages of the record with the judge asking the defendant about this outside of the presence of government counsel. So the defendant says, well, he doesn't trust his lawyer because he lied to him. He said everything was going well, and he didn't. He didn't talk to him enough. He doesn't come to see him in jail. I suppose there's some other concerns that he has. Is that enough, do you think, to say there's a breakdown in communication? No, Your Honor, and the judge addresses each of those points as well. For instance, the defendant says, I don't trust the attorney, but then he gives a reason why, and he says, Mr. Morell told me that we had a good shot of winning this motion to dismiss. And Mr. Morell said, I told him I thought we had a decent argument. And the judge addresses that. He says, yes, I made my decision. That's appealable. But that's not a total breakdown of communication. If anything, that's indicative of communication. The defense counsel telling the defendant what he thought of the case, and simply it turned out that he didn't win the motion and the defendant was upset about that. But that's not a breakdown in communication. In fact, much of what the defendant complains about throughout the trial is indicative of communication, not a breakdown of communication. He says, I don't trust him because, for instance, of the offer that I'm getting from the government. And the defense counsel, that means that the defense counsel was communicating that offer and communicating what the defense counsel thought of that offer. So that's indicative of communication, actually. And we see that over and over. In fact, at no point throughout the trial, in the many times that the defendant talks to the trial judge, did he say there's some kind of breakdown of communication. He complained a couple times that the defense counsel had not come to talk to him on a particular occasion. For instance, the morning of the second day of trial, that was a Tuesday, the defendant said Mr. Morell was supposed to come talk to me, but he didn't. And Mr. Morell addresses that. The court addresses that. In fact, he had gone to talk with him the night before, and then he had been stuck. At one point, Cabrera complains that Morell came to see him, but got up and walked out on him. Doesn't that indicate something of a breakdown in communications? On certain occasions, there was perhaps a temporary lapse where besides the defense counsel and the defendant were obviously frustrated with each other. And I believe that happened before the trial. That defendant said that the defense counsel had just gotten up and walked out. And I think Mr. Morell talked about that. He said, there was a time when I became so frustrated, I just had to get out of there. It just wasn't working at that point. But then the evidence is that he continued to meet with him. He met with him the weekend before trial. So they talked about that at the motion hearing before trial. The defense counsel met with the defendant over that weekend. And then that night, after the first day of trial they met, there was a break in the middle of trial on Wednesday. They met on that day, and they met for long enough that on Thursday, Mr. Morell came in with an entire list of issues that the defendant wanted to address that day. And he raised each one with the court. And it was a list that the defense counsel had obviously gone over with the defendant on Wednesday of trial. So not only are there the five meetings before trial, on at least one occasion of which, yes, the defense counsel and defendant were frustrated with each other, but then there was continued communication throughout the trial. And the record shows that, in fact, there was communication after trial. When, after the defendant was convicted, he still went to defense counsel to ask if he thought he should make a motion for a new trial. So there's no complete breakdown of communication at any point in the trial process. And the fact is, the trial judge was in the best position to see the defendant's demeanor when he was talking about this, and to judge on the record whether there was a breakdown made a finding of fact that there was not. He made a finding of fact that the defendant was simply trying to delay the trial. And it certainly wasn't an abuse of discretion. It didn't rise to the situation in Nguyen where the judge, seemingly without consulting the defendant at all, made his decision and did so based on his own schedule because he said he didn't want to fly back to Guam. This is a situation where a trial judge did absolutely everything in his power to be sure that the defendant had a chance to express what his problems with defense counsel were. And when given that chance, the defendant didn't talk about a breakdown of communication. He talked about the offer that the government was giving him. So moving on to how we know that the defendant was convicted of an aggravated felony, this is the simple two-step process under the modified categorical approach. And the first question is just which subsection of that Arizona statute was the defendant convicted under? And the record is clear that he was convicted under subsection A2. Both the plea agreement and the colloquy refer to counts three and four of the complaint, and the defendant agrees to plead guilty to those counts. Now, counts three and four of the complaint have language that is a direct quote from section A2 of the statute. And the language in those counts doesn't match sections A1 or sections A3 at all. So there's no question which subsection of the statute this is talking about. When he pleads guilty to those counts in the complaint, he is pleading guilty to all of the elements of section A2 of that statute. And to go to the second prong of the analysis, we know that section A2 of that statute does constitute a crime of violence. We know that from Saron Sanchez. Wasn't that overruled by Fernandez Ruiz? Correct, Your Honor. It was overruled in part and not on that point. I don't see why it wasn't. I know that was the argument in the briefs, but I guess I don't see why it wasn't overruled in full, because Saron refers only to 1203A and doesn't – and we know that one of those three prongs includes recklessly, which Fernandez Ruiz said is not enough. Correct, Your Honor. So Fernandez Ruiz found – Saron Sanchez found that this 1203A was categorically a crime of violence. Fernandez Ruiz says it's not categorically a crime of violence because certain subsections, specifically A1, do not require intent. And there's a footnote – I think it's footnote 6 in Fernandez Ruiz where it says we're not addressing subsection A2 of this Arizona statute because we find that A1 does not require intentional conduct and therefore this can't be a categorical crime of violence. And under the categorical analysis, therefore, we don't have to go any further. And the government actually in Fernandez Ruiz did ask to remand to develop the facts that the crime in that – that the defendant was charged with in that case, in fact, fell under A2. And the court declined over Judge Kaczynski's dissent to remand for that purpose. But Fernandez Ruiz expressly does not reach whether A2 would, under the modified categorical approach, be a crime of violence. And so don't we have to look at that in the first instance now with Leo Cowell and Fernandez Ruiz? And if so, is it a crime of violence if we look only at A2? Well, if we look only at A2, it's a crime of violence. Which is what we have in this case, is your argument, right, that he was convicted of 1203-A2 and 1204-A2? Correct. And so why is 1203-A2 and 1204-A2 read together a crime of violence under the modified categorical? Okay, so 1203-A2 – I mean, McCulloch has confirmed this, that any time we have intentional – putting someone intentionally – intentionally putting someone in apprehension of imminent physical injury, that by its terms would constitute a crime of violence under prong A of the federal definition. And I think that's what McCulloch gets at. By its terms, it satisfies that definition. And then the firearm enhancement, which was 1204-A2 – and by the way, we know that that's the section of 1204 that was pleaded to because it refers to a firearm and none of the other enhancements in that section refer to a firearm. It has to be A2. But Cerron-Sanchez, as well as the language of the statute itself, show that that firearm enhancement itself meets subsection B of the federal crime of violence definition. So if we know that he was convicted under subsection A2 of respectively 1203 and 1204, and we have Ninth Circuit case law that tells us that those subsections, in fact, do meet the federal definition of crime of violence. And you're relying on McCulloch for that? Yes, Your Honor. And McCulloch was coming up from a Board of Immigration Appeals decision, and this court found that assuming he was convicted under A2, which he was, that then it would be a crime of violence under subsection A of the federal crime of violence statute. So unless the court has any questions on the acceptance of responsibility issue, the government would submit. Okay. Thank you. I know an important issue for this Court is whether this is a defendant who's simply obstructing proceedings, trying to get his way, hoping to manipulate into getting a better deal out of someone. And I can understand the trial court and the prosecutor being worried about that. But the evidence doesn't add up to that, the evidence that's in the record. And the government is confusing the issue of the ability to speak to a client with a breakdown in communications. A breakdown in communications means that the two parties are no longer effectively that which the attorney must know and that which the client must decide. And the evidence is that they're screaming at each other, they're yelling at each other. So opposing counsel is relying on the transcript of the hearing, referring us to the discussion where the defendant states that his problem is, Mr. Morell told me that he was going to reduce the felony offense down to a misdemeanor and then later saying the truth is, I mean, I don't want to go to trial. It's not fair. I want to have a better deal. And so opposing counsel is focusing on this transcript, which suggests that the defendant has other concerns, and that's why he's asking for a new attorney. How should we read that? I'd ask this Court to read it this way. That's evidence that, circumstantial evidence of why the appellant in this case isn't communicating with Mr. Morell. And it's because Mr. Morell wasn't following through on his promises. Now, the client's probably confused. They frequently are. It's a confusion. You're in jail, and you're here in the United States in jail, and these are difficult charges, difficult to understand. He hasn't had the attorney for that long. But the record is clear. Mr. Morell never hired an investigator for this case, and that's really what the client's talking about. And the client did ask, probably did ask, or Mr. Morell recognized there's an issue. Maybe I can reduce this to a misdemeanor, and maybe that will help with sentencing. But how could an investigator change the law of Arizona, which does not provide for wobbler status for this type of a crime? It's not like California. Right. How would an investigator change it? This is the problem. The investigator could have gotten the court records, could have interviewed witnesses, or more importantly, maybe put Mr. Morell in contact with someone who knew the answer to that question. But that's a sentencing issue. That's not what the record shows. The record shows that Morell did investigate with sources in Arizona about reducing the felony conviction to a misdemeanor and was told because of the passage of time and because of the legislation in Arizona that unlike California, there's no 17B in Arizona, there was no chance of reducing it. So what would an investigator have done that Morell didn't do? Well, let me set aside the investigator issue for a second and focus in on what Mr. Morell did. Mr. Morell, on the record, said, I called a court and talked to a clerk. And if I did my legal research that way, that would be ineffective assistance of counsel. If he didn't understand Arizona law, and I don't understand Arizona law, he needed to speak to an attorney about that. Because calling the clerk and asking the clerk of the court, can I reduce this to a misdemeanor and getting a no, is not adequate preparation. But it sounds more like an ineffective assistance of counsel type claim. Well, but that would, if you're a client and your attorney tells you, I just called the clerk of the court and asked, you would, I think, intuitively understand that you don't call a clerk. And that would be the reason for the breakdown in the communication. The investigator issue, remember there were two charges. There was the aggravated identity theft, which added a mandatory two years, and the 1326, the deported alien found in the United States. And Mr. Morell ---- After being deported. Right, right. After being deported, of course. The by not having an investigator on that case, pulling all the facts together They never discussed, Mr. Morell and the client, the issue of bifurcation, of trying to, how they were going to try this case in a way that would allow him to defend the aggravated identity theft without avoiding prejudice. Because remember, he had prison documents in his pocket, because the identity was for that other person. No one apparently ever interviewed before trial that person whose identity documents were in the pockets. That would concern me if I was a client. And that would concern any client enough that they might complain about their attorney and say I'm not communicating, he's not coming to see me. And it's clear from the record that wasn't discussed. And Mr. Morell says a week before the trial, I'd like more time, or the client and I can talk about the facts. Well, a week before trial. And it's all about, if you want a breakdown in relationship with a client, don't talk about the facts, don't hire an investigator, see him four or five times in the entire time you represent him, and go through a complicated motion hearing when the defendant's looking at an eight-year sentence, which is what he got. And I believe that shows a total breakdown in communication, and we ask this Court to so bold. Thank you. Thank you, Mr. Johnson. Thank you, Mr. Martin, for the argument. Cabrera-Perez is submitted.
judges: Bybee, Bea, Ikuta